# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | |
| WILLIAM JESSE NORMAN ) | Case No.  05-22078-TLM |
| ) | |
| Debtor. ) | MEMORANDUM OF DECISION |
| _____ ) | |
| ) | |
| PANHANDLE STATE BANK, INC., ) | |
| an Idaho corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 06-07003-TLM |
| ) | |
| WILLIAM JESSE NORMAN ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**INTRODUCTION**

Panhandle State Bank ("Plaintiff") brought this adversary proceeding under § 523(a)(6) objecting to the discharge of a portion of an indebtedness owed to it by chapter 7 debtor William Jesse Norman ("Defendant"). Trial in the matter occurred on June 29, 2006, and the Court took the matter under advisement. This Decision constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052.

MEMORANDUM OF DECISION - 1

**FACTS**

The facts were presented through several documents stipulated into evidence as exhibits, three depositions the parties agreed could be used as direct trial testimony, and the in-court testimony of numerous witnesses. The Court has considered carefully each of these sources and, as to testimony before it on June 29, has considered questions of the witnesses' credibility and the weight to be given their testimony.

Defendant is a long-haul truck driver. Despite long stretches away from home, he decided to enter into business as the owner of "One-Eyed Jacks Steakhouse, Inc." His corporation obtained a business loan from Plaintiff in June 2003, and Defendant guaranteed that obligation.

Defendant secured his guaranty by granting Plaintiff a security interest in two vehicles he owned. Ex. 1. The first was a 1991 Ford F-150 pickup, VIN 1FTEX14H1MKA20470 (the "1991 truck"). Ex. 2. The other was a 1953 Ford pickup, VIN F10D3L16367 (the "1953 truck"). Ex. 3. There was no evidence that Plaintiff inspected, appraised or even saw the vehicles at the time of the loan.[1] The liens, however, were properly perfected by notation on the certificates of title. *See* Exs. 2, 3.

---

[1] The loan officer and branch manager, Chris Pederson, was not examined on the point. Plaintiff's special assets manager, Daniel Yeatts, indicated the 1953 Ford was ascribed a value of $12,000.00 to $15,000.00 as a "restored" vehicle and the more valuable of the two. How he reached these conclusions was not explained.

MEMORANDUM OF DECISION - 2

The loan matured in June 2004, with no payments having been made other than some interest. Plaintiff's branch manager, Chris Pederson, talked with Defendant sometime between June and August 2004 about payment of the debt. However, when no payments were made and no understanding reached as to satisfaction of the debt, Pederson transferred the account to Plaintiff's special assets manager, Daniel Yeatts.

Discussions between Yeatts and Defendant occurred but were similarly unfruitful. On October 20, 2004, Yeatts issued a written demand for payment and, unless paid in full, for delivery of the vehicle collateral. Ex. 7. Defendant did not respond. On November 12, 2004, Plaintiff commenced an action against Defendant. Ex. 4. A $21,817.06 default judgment was entered against Defendant on December 17, 2004. Ex. 6. The judgment ordered the County sheriff to take possession of and sell the vehicle collateral. *Id.*

In late January or early February, 2005, Plaintiff's employees noticed an older model gray pickup in their parking lot at the Rathdrum branch. Concerned this was an abandoned vehicle, Plaintiff contacted the local police. The police checked the registration paperwork found in the vehicle, and asked Plaintiff if the registered owner, evidently Defendant, might be a customer. Plaintiff realized this vehicle was the 1991 Truck and part of their collateral. Plaintiff's employees testified the 1991 Truck was the only vehicle found in the lot.

MEMORANDUM OF DECISION - 3

Defendant testified he left the 1953 truck in the lot at the same time he left the 1991 truck. He stated he towed both vehicles there using his semi-tractor. His daughter's boyfriend, Brandon ("Randy") Peterson, testified he helped Defendant tow the two vehicles to that lot on a Saturday afternoon.

Defendant testified he followed up the weekend delivery of the trucks with a telephone conversation with an employee of Plaintiff, Gina Dean, the following Monday, a call made in part because he left the keys in the vehicles.[2] Defendant's deposition testimony was specific as to his talking to Ms. Dean and the substance of the Monday call. Ex. 11 at 12-13. Gina Dean testified no such call occurred.

As noted, Plaintiff found only the 1991 truck in the lot. Defendant's assumption is that "someone" removed the 1953 truck after its delivery. In this regard, Defendant offered the testimony of Kellie Swofford, who lived near Defendant on California Street in Rathdrum. Ms. Swofford stated that in March or April of 2005, she saw Defendant's former girlfriend, Katie Castro (*nee* McNinch) driving Defendant's older, dark purple, restored Ford pickup down that same street. Ms. Swofford recognized Ms. Castro, and she knew the 1953 truck because she had seen it in Defendant's garage in the past.

---

[2] In Defendant's deposition, he testified the keys were left in the ignition because a "bank manager" he talked to a couple of days prior to the delivery told him to do so. Pederson was never examined about this allegation.

MEMORANDUM OF DECISION - 4

Katie Castro also testified.[3] She lived with Defendant between February and September of 2004. She said she was aware of the obligation Defendant owed Plaintiff and heard him state in June or July of that year that he would not surrender the 1953 truck to the bank. According to Ms. Castro, Defendant said he would find another truck and switch the VIN plates in order to keep his truck.[4] Plaintiff believes that this is what Defendant in fact did.

In September of 2004, Rathdrum Police Lt. Alex Carrington went to Defendant's California Street residence at Defendant's request to perform a "VIN inspection" on a 1953 Ford pickup. The truck, according to Lt. Carrington, was a very nice, customized "maroon" colored vehicle. Lt. Carrington found a VIN plate in the glove box ending with the number "14470."[5] He then matched this number to a Washington state certificate of title Defendant had and which

---

[3] Ms. Castro testified prior to Ms. Swofford taking the stand. Ms. Castro was dismissed as a witness at the conclusion of her testimony. Plaintiff did not recall Ms. Castro and question her regarding Ms. Swofford's testimony, specifically the March/April sighting of Ms. Castro driving Defendant's restored Ford pickup.

[4] In attacking Ms. Castro's crediblity, Defendant testified that Ms. Castro took a Chrysler LeBaron convertible belonging to Defendant at the time their relationship ended in September 2004, and fraudulently obtained a new title in her name. (She testified it was a gift to her.) In October, 2005, Defendant obtained a judgment, following a state court trial, declaring him to be the rightful owner of the LeBaron and entitled to have it titled in his name. Ms. Castro concedes she lost that litigation. Defendant appears not so subtly to suggest that Ms. Castro, driven by enmity, used a retained key or the key left with the vehicle to take the 1953 truck from the bank's parking lot in early 2005. Ms. Swofford's testimony regarding the spring 2005 sighting of Ms. Castro was evidently offered in support of the theory.

[5] Lt. Carrington knew VIN plates were generally on the firewall, in the glove box, or on the driver's side front pillar. He said Defendant pointed out the plate in the glove box.

MEMORANDUM OF DECISION - 5

Defendant was going to use to register the vehicle in Idaho. *See* Ex. 9. Defendant told Lt. Carrington he bought this truck for his daughter.[6] The documents provided to Lt. Carrington indicated the vehicle was purchased from Danny West in September 2004, for $250.00. Ex. 9. This $250.00 amount is inconsistent, however, with the quality and apparent value of the vehicle Lt. Carrington saw.[7]

Danny West testified by deposition. He said he owned only one 1953 Ford pickup, had acquired it in 1986, and sold it in 1987. He could not recall the buyer.[8] He said the vehicle's color was "root-beer brown" and its frame was cracked. When shown a copy of the endorsed Washington certificate of title for VIN #14470 – used by Defendant to verify the VIN and register the vehicle in Alechia Norman's name – West verified his signature and the typed 1986 vehicle registration date.[9] However, he adamantly denied the "9-3-04" date of sale was correct. He indicated he sold the truck in question in 1987 and had not sold any

---

[6] Defendant's daughter, Alechia, did not appear at trial, and testified only by deposition. She stated she acquired a 1953 Ford pickup in October, 2004, as a gift from Defendant, took it to Spokane and stored it at her mother's house, put it on a trailer and towed it to Boise when she moved there and sold it in December, 2004, in Boise for $800.00 cash. Alechia said "her" 1953 Ford was green in color, with some purple primer, and that Defendant's 1953 Ford pickup was a "purple maroon" color.

[7] Lt. Carrington thought the truck was quite nice and desirable. He also recalled that Defendant said he got "a good deal" on the truck but not if an amount was stated.

[8] Later in his deposition West indicated that the "Normans" lived near Springdale, Washington, and had a number of Fords, and that he might have sold the truck to "Gary Norman."

[9] Depo. Ex. 1 is also page 3 of Ex. 9, the materials filed by Defendant and/or Alechia Norman to register the 1953 truck under VIN #14470.

MEMORANDUM OF DECISION - 6

Ford trucks since 1991. Additionally, he asserted the $250.00 sale price inserted on the certificate was, like the sale date, not in his handwriting.[10]

Plaintiff's theory is that the maroon 1953 Ford viewed by Lt. Carrington was, in fact, Defendant's 1953 truck and its collateral. Plaintiff posits that Defendant acquired the #14470 VIN plate from another vehicle, attached it to the 1953 truck (and removed or concealed the original VIN #16367) sometime in 2004, and sought the VIN verification in order to fraudulently conceal his continued ownership and possession. Plaintiff also believes that, given the documents used and West's testimony, Defendant's several factual assertions to Lt. Carrington and to the State of Idaho in registering "Alechia's vehicle" in the fall of 2004 were false. Plaintiff also believes Defendant never delivered his 1953 truck to the bank's parking lot in early 2005 and, thus, that his testimony was and is false.[11]

The evidence, and inferences, regarding the vehicles and VINs are not limited to the foregoing. Plaintiff also called Cliff Jones who testified *he* owns a 1953 Ford with VIN #14470. Jones is retired but runs a parts business specializing in 1953-1956 Ford pickups, and he has specialized in such vehicles

---

[10] In addition, West testified he paid $1,200.00 for the truck with VIN #14470 and would never have sold it for $250.00.

[11] This would necessarily create an issue about Randy Peterson's testimony being false, as discussed *infra*.

MEMORANDUM OF DECISION - 7

for some 20 years. Jones identified his truck from a State of Washington VIN plate on the driver's side door pillar, a plate that was there when he acquired the vehicle in 2002 from Dave Brumley, a prior customer. Jones acknowledged the VIN plates on 1953 Fords were originally inside the glove box door, but he said the plates were attached by sheet metal screws and could be easily removed.[12] He said that when he bought the truck from Brumley there was a glove box door but no VIN plate on it.[13] Jones also testified he looked at his vehicle and found a manufacturer's original VIN #14470 factory stamped on the front-chassis cross member.

## DISCUSSION AND DISPOSITION

### A.    Standards under § 523(a)(6)

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." Injury to a creditor's property through conversion is covered by this statutory language. *See Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999); *see also Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 00.4

---

[12] Defendant countered that they were affixed with rivets and could not be easily removed.

[13] Plaintiff infers, given Jones' testimony, that Defendant in some fashion obtained the glove box VIN plate bearing #14470 – at some indeterminate point in time – and then attached it to his 1953 restored maroon Ford prior to the solicited visit by Lt. Carrington for VIN verification. Plaintiff appears to infer that this taking of the glove box door and/or VIN plate occurred between West's 1987 sale of truck #14470 (to someone) and Jones' purchase from Brumley in 2002.

MEMORANDUM OF DECISION - 8

I.B.C.R. 199 (Bankr. D. Idaho 2000).

The creditor asserting this cause must prove all requisite elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Endicott*, 254 B.R. at 475. Under *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1144-45 (9th Cir. 2002), the § 523(a)(6) plaintiff must establish the injury was both "willful" and "malicious." Like other objections to dischargeability, claims under § 523(a)(6) are narrowly construed against the creditor. *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

The "willfulness" element requires that the debtor intended the consequences of his action, and not just the action itself. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Su*, 290 F.3d at 1144-45; *Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 427 (9th Cir. BAP 2002). An injury is willful when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed the injury was substantially certain to result from his conduct. *Su*, 290 F.3d at 1142-46.

The injury must also be "malicious," which requires the debtor intentionally perform a wrongful act which necessarily causes injury and is done without just cause or excuse. *Id.* at 1146-47. Under this Circuit's law, willfulness and malice are two separate elements that are not to be conflated. *Su*, 290 F.3d at 1147. In the context of conversion, malice may be inferred from the act itself, but

MEMORANDUM OF DECISION - 9

it must first be established the conversion was a "willful" injury. *Thiara*, 285 B.R. at 434.

### B.     Proof of conversion

Although bankruptcy law determines the dischargeability of debts, state law determines whether a conversion has occurred. *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1206 n.16 (9th Cir. 2001); *Bailey*, 197 F.3d at 1000; *Thiara*, 285 B.R. at 427. Under Idaho law, conversion is defined as "a distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein." *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999). "[I]f possession of property was not acquired by a tortious taking or the possessor does not appropriate or use the property in a fashion to indicate a claim thereto adverse to the owner, then no evidence of a conversion exists until there is proof, first, that a proper demand for possession was made by the one who is entitled thereto and, second, that the possessor wrongfully refused delivery." *Id.* at 616-17.

However, simply because a conversion occurs does not mean, *ipso facto*, a willful and malicious injury has occurred. *Peklar v. Ikerd (In re Peklar)*, 260 F.3d 1035, 1037-39 (9th Cir. 2001) (holding that conversion is not per se a willful and malicious injury to property of another; it establishes only wrongful assertion of dominion and does not necessarily decide other requisite § 523(a)(6) elements).

MEMORANDUM OF DECISION - 10

So, Plaintiff must first prove Defendant converted the 1953 truck, *i.e.*, "wrongfully refused delivery" after "a proper demand for possession" was made. Absent a conversion, there is no reason to determine whether Defendant's conduct was sufficiently "willful" and "malicious." *See id.* at 1038 ("a failure to prove conversion is fatal to an argument that defendant's conduct caused 'willful and malicious injury.'").

Plaintiff did not conclusively prove Defendant still possesses (or conveyed to another) the 1953 truck. Plaintiff lacks a "smoking gun" in this regard. It relies instead on the totality of the circumstantial evidence and the several inferences it draws therefrom.

While the Court agrees highly suspicious circumstances are present, and finds that Defendant's version of events and credibility were effectively attacked, it concludes Plaintiff ultimately failed to carry its burden of proof. Such seemingly conflicting determinations require explanation.

Several aspects of the evidence either support Plaintiff's theories or impeach Defendant's testimony.

Defendant affirmatively stated he delivered the 1953 truck to the bank's employee parking lot one Saturday afternoon in the winter of 2005. Defendant indicated he called Plaintiff's employee, Gina Dean, the Monday after delivering the trucks. Ms. Dean flatly denied this occurred, and she claims she never spoke

MEMORANDUM OF DECISION - 11

with Defendant on any matter. The Court finds Ms. Dean's testimony credible.[14]

Defendant also indicated to Lt. Carrington that he purchased "Alechia's truck" as a gift. Defendant proffered the West-endorsed Washington certificate of title containing a 9-3-04 sale date to Lt. Carrington to establish this purchase, and to verify the VIN, and used the same certificate to register the truck in Idaho. But West denied selling this truck in 2004, affirmatively testified it was sold in 1987, and indicated the handwritten dates and amount of sale shown on the certificate were not only inaccurate but not in his handwriting.

In addition to West's testimony, Defendant's own deposition testimony is materially at odds with his trial testimony that he purchased the truck in September 2004, as a gift. In his deposition, he testified that *Alechia* bought her 1953 Ford from "someone in Spokane" but he did not know when.

As already noted, Alechia testified Defendant bought the vehicle, and that she received it from him as a gift. Alechia also testified "her" gifted truck was green in color, with some primer, but that her father's 1953 truck was "purple-maroon."[15] Lt. Carrington testified the vehicle Defendant presented to him on September 30, 2004, for VIN verification was a nice, customized, "maroon"

---

[14] The Court also finds it difficult to accept Defendant's deposition assertion that the bank would instruct a customer to deliver collateral when the bank was closed and leave the keys in the vehicles. However, this assertion was not tested in trial examination of Defendant or Plaintiff's employees.

[15] Ms. Swofford also testified that Defendant's truck was "dark purple."

MEMORANDUM OF DECISION - 12

truck.[16]  The $250.00 sales price as represented on the certificate of title Defendant tendered cannot be reconciled to the condition and value of the truck Lt. Carrington observed.  Nor was there any evidence that Defendant restored and customized "Alechia's" present between the September 3, 2004 purchase and the September 30, 2004 inspection by Lt. Carrington.  Further, Alechia testified she sold "her" truck for $800.00 in cash before the end of 2004, also not an amount consistent with the quality of the truck Defendant presented to Lt. Carrington for VIN verification.

Notwithstanding these several attacks on Defendant's evidence and credibility, Plaintiff did not similarly deal with the testimony of certain of Defendant's witnesses.

Ms. Swofford gave unrebutted testimony that she saw Defendant's ex-girlfriend, Ms. Castro, driving Defendant's dark purple 1953 Ford in the spring of 2005.  This was three or four months after Defendant allegedly delivered it to the bank, and also some 7 months after Ms. Castro and Defendant ended their relationship.  Ms. Swofford appeared to be credible.  Though she was Defendant's neighbor, no other connection or relationship with Defendant was shown to exist.  The Court was provided no reason to conclude Ms. Swofford fabricated her

---

[16] Defendant unequivocally testified at trial that the (maroon) vehicle Lt. Carrington saw was one Defendant purchased in September, 2004, in Washington, *i.e.*, his gift for Alechia.  In his deposition, Defendant said that Alechia's truck was "green" in color.

MEMORANDUM OF DECISION - 13

testimony.

Next, Randy Peterson testified that he assisted Defendant in delivering the vehicles. Randy has an ongoing (though, he says, an "off and on") relationship with Defendant's daughter and is the father of her child. Thus, there certainly might be motivation for him to support Defendant's version of events. However, Randy appeared credible, and he was not effectively cross examined. The Court was given no reason, other than supposition from the existence of a relationship with Defendant's daughter, to conclude Randy was testifying falsely when he said he helped deliver the two vehicles to the lot.

Randy's testimony ends with the delivery of the vehicle, and he was not examined about anything that happened or that he might have observed subsequently. *If* the 1953 truck was removed after they delivered it (which under Defendant's version was possible given the keys were left with the vehicles), Randy would have no apparent way of knowing who – Castro, Defendant, or a stranger – removed it.

If Plaintiff's case is to withstand Randy's testimony regarding delivery of the vehicle, the Court must conclude (1) Randy is lying, or (2) Defendant set up Randy as an unwitting alibi witness to the vehicles' delivery only to later go back and pick up his 1953 truck.[17]  Plaintiff did not establish the first proposition. Its

---

[17] Plaintiff's case is premised on Defendant taking several interrelated steps to falsely
(continued...)

MEMORANDUM OF DECISION - 14

examination of Randy failed to impeach his credibility or attack the veracity of what he said occurred in the vehicles' delivery. Randy's on-again, off-again relationship with Alechia and his contacts and occasional residence with Defendant may have provided Plaintiff fertile ground for examination, but it was not cultivated.

But beyond Randy, there is the problem presented by the testimony of Ms. Swofford. Her testimony about seeing Ms. Castro behind the wheel of Defendant's truck in the spring of 2005 was unassailed, as was her credibility. Though Plaintiff urged several theories about what occurred to account for the variants in the evidence, it presented no plausible scenario to account for Ms. Swofford's testimony.[18]

Plaintiff established multiple inconsistencies in and problems with Defendant's testimony. However, Plaintiff failed to effectively deal with the testimony of Kellie Swofford and Randy Peterson.[19]

---

[17](...continued)
register his 1953 truck under VIN #14470 in order to conceal its continued possession. It is not a necessarily inconsistent theory to suggest that the vehicle was delivered, with Randy, and then retrieved to create a suggestion of surrender of collateral and that, in addition, the fraudulent VIN scheme was conducted in order to explain away Defendant's possession of a maroon 1953 Ford should it later be discovered.

[18] The Court discounts any suggestion that Defendant allowed Ms. Castro to drive the vehicle. Their testimony corroborated the end of their relationship, and provided no inkling of a reconciliation. Their bitterness toward one another was not just manifested by the state court litigation over the LeBaron but was also palpable during trial in this cause.

[19] In addition to the testimony of these two witnesses, there were other, lesser problems
(continued...)

MEMORANDUM OF DECISION - 15

Plaintiff cannot say with any certainty what happened to its collateral. Plaintiff strongly suspects – in fact the Court is confident Plaintiff is firmly and unshakably convinced – that Defendant actively concealed the vehicle through a VIN-switching subterfuge[20] and that Defendant either still has the truck or has disposed of it and retained its value. There is much in the evidence that supports Plaintiff's suspicions. However, Plaintiff must establish by a preponderance of the evidence each element of its § 523(a)(6) complaint. Evidence is what differentiates suspicion from an actionable cause.

The Court concludes that, even though close and even though much of the circumstantial evidence favors Plaintiff's contentions, Plaintiff's case ultimately falls short of the mark in establishing the fact of conversion. Consideration of the other elements of § 523(a)(6) is thus not required. *Peklar*, 260 F.3d at 1038.

**CONCLUSION**

Upon the foregoing and for the reasons stated, the Court will enter judgment for Defendant, and Plaintiff's complaint will be dismissed. Defendant

---

[19](...continued)
with Plaintiff's case. For example, its "motive" witness on VIN-switching, Ms. Castro, had her own credibility issues that were not fully negated. And Plaintiff did not effectively address Alechia's claimed disposition of "her" truck re-titled and registered under VIN #14470.

[20] The details of the subterfuge were not completely explained, though Plaintiff suggests some ways that the ambiguous or seemingly conflicting evidence can be reconciled. Plaintiff's suggested reconciliation of testimony in support of its theory of the case is necessarily coupled with either perjured testimony by Randy or Defendant's clever use of a duped and innocent Randy to generate a putative delivery of the collateral.

may submit a proposed form of judgment accordingly.

DATED: August 21, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 17